1
2
3
4
5
6

UNITED STATES DISTRICT COURT
For the Northern District of California

# UNITED STATES  DISTRICT COURT

## Northern District of California

7    LEE FEDERICO,                                No.  C 12-2588 MEJ

8                            Plaintiff,           **ORDER RE: DEFENDANT'S**
                                                  **MOTION FOR SUMMARY**
9         v.                                      **JUDGMENT**

10   OVERLAND CONTRACTING, INC.,
                                                  **(Docket No. 29)**
11                           Defendant.
     _____/

12

13                              **INTRODUCTION**

14           Plaintiff Lee Federico brings this action for damages related to his employment as a

15   construction manager at Defendant Overland Contracting, Inc.  First Am. Compl. ("FAC"), Dkt. No.

16   21.  Defendant now moves for an order granting summary judgment in its favor.  Dkt. No. 29.

17   Plaintiff has filed an Opposition (Dkt. No. 35), to which Defendant has filed a Reply (Dkt. No. 37).

18   The Court finds this matter suitable for disposition without oral argument and hereby VACATES the

19   October 3, 2013 hearing.  Civ. L.R. 7-1(b).  After carefully considering the parties' briefs and the

20   controlling legal authorities, the Court GRANTS IN PART and DENIES IN PART Defendant's

21   Motion for the reasons set forth below.

22                              **BACKGROUND**

23           Defendant provides construction management for telecommunications projects.  Kline Decl.

24   ¶ 5, Dkt. No. 29.  With such construction projects, Defendant uses multiple levels of management.

25   A regional construction manager ("RCM") has overall responsibility for construction in a given

26   region.  *Id.*  The RCM supervises a number of lead construction managers ("LCM"), who supervise

27   field construction managers ("FCM"), who in turn supervise the subcontractors who do the physical

28

construction.  *Id.*, Exs. B and C.[1]  According to the job descriptions for LCMs and FCMs, both positions are responsible for managing the overall project execution performance, including scope, cost, safety, quality, schedule, implementation, and customer satisfaction.  *Id.*

Defendant hired Plaintiff on August 8, 2011, as an FCM on the Sprint Network Vision Project.  Jt. Stmnt. of Undisputed Facts ("JSUF") ¶¶ 1, 2, Dkt. No. 30.  Plaintiff's resume claimed he had "Over 16 years of hands-on experience as a Union Apprentice, Tower Hand, General Foreman, Superintendent, Construction Manager, Safety Steward and Owner in the Construction Business." Dkt. No. 29, Ex. A.  According to his resume, Plaintiff's professional strengths included "complex/construction project management" and "budget and expense control."  *Id.*  He claimed approximately four years experience in telecommunications construction, and seven years as co-owner of a construction firm.  *Id.*  Defendant states that it hired Plaintiff "because he had the experience and knowledge necessary to make independent judgment calls when planning and managing the upgrade of a sophisticated cellular network."  Kline Decl. ¶ 15.  Defendant paid Plaintiff an annual salary of $93,000 plus benefits, and his employment was at will.  Dkt. No. 29, Exs. D, J.  Defendant promoted him to LCM in October 2011.  JSUF ¶ 2.  Plaintiff states that he was reluctant to assume the LCM position.  Stuckey Decl., Ex. A (Federico Depo.) at 31:3-32:9, Dkt. No. 35.  As of October 24, 2011, Plaintiff understood that he was a salaried employee, and that Defendant would not pay him overtime.  *Id.* ¶ 6.

**A.      Network Vision Project**

The Sprint Network Vision Project is an open-ended, nation-wide upgrade of Sprint's wireless network infrastructure from 3G technology to 4G technology, which is also known as Long-Term Evolution.  Kline Decl. ¶ 7.  Defendant plans the installation of 4G equipment on Sprint's cell sites and then hires and supervises the subcontractors who do the physical installation.  *Id.* ¶ 8.

---

[1] Defendant filed three declarations – Charles Kline, Julia Azrael, and Edmund Tonner. However, the declarations were filed as one docket entry and all of the exhibits were filed together, rather than separated by the declaration to which they relate. Dkt. No. 29. Accordingly, for ease of reference, the Court shall refer to exhibits only by docket number and letter.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1     According to Defendant, cell sites are leased properties located according to the requirements

2     of radio frequency engineering and the constraints of available real estate. *Id.*  The Bay Area portion

3     of Network Vision includes approximately 1,200 cell sites, which can be located on rooftops, in

4     parking lots, and on schoolyards, among other places. *Id.* ¶ 10.  Because Network Vision is an

5     upgrade, 95% of the sites were already leased and built. *Id.* ¶ 11.  Sprint's 4G equipment had to be

6     installed alongside the old 3G equipment, which had to continue working until the new equipment

7     was up and running. *Id.*

8           The upgrade of each site required the collaboration of four groups: radio frequency engineers

9     ("RF"), who were responsible for ensuring that the equipment as installed would properly send and

10    receive signals; site acquisition professionals ("SA"), who were responsible for obtaining or

11    modifying leases and obtaining permits from local governments; architecture and engineering firms

12    ("A&E"), who were responsible for designing the sites and producing zoning and construction

13    drawings; and construction managers (the RCM, LCMs, and FCMs). *Id.* ¶ 12.

14    **B.     Plaintiff's Job Duties as FCM and LCM**

15          As an LCM, Plaintiff was responsible for approximately 250 sites. *Id.* ¶ 15.  Defendant

16    states that an LCM's principal activities in the Network Vision Project were evaluating the

17    feasibility of equipment installation on a site, determining the scope of work necessary for the

18    installation (scoping), reviewing construction drawings (redlining), reviewing purchase order

19    requests, updating the construction tracker, supervising FCMs, and forecasting dates that various

20    tasks would be accomplished. *Id.* ¶ 14.  Plaintiff states that his principal duties included redlining,

21    research and data entry, site inspections/walks, participating in the bidding and change order

22    process, and attending meetings.  FAC ¶ 8; Opp'n at 6.

23          1.     Redlining

24          It is undisputed that Plaintiff spent 30% to 40% of his time redlining drawings from August

25    8, 2011, to early October 2011.  JSUF ¶ 3.  It is also undisputed that, from early October 2011 to

26    February 13, 2012, Plaintiff spent 20% of his time redlining. *Id.*  According to Defendant, the

27    purpose of redlining is quality control - reviewing drawings created by A&E and, if necessary,

28

3

UNITED STATES DISTRICT COURT
For the Northern District of California

1   indicating what changes needed to be made on the drawings and sending them back to A&E to be

2   corrected.  Kline Decl. ¶ 16.  Plaintiff redlined both zoning drawings (for zoning approval by local

3   government) and construction drawings (more detailed drawings also used by subcontractors).  *Id.*

4   ¶¶ 17, 18; Dkt. No. 29, Ex. E (Federico Depo.) at 39:17-19.  In redlining the drawings, Plaintiff

5   indicated changes to be made and returned them to A&E for revision.  *Id.* ¶¶ 17, 18.  A&E revised

6   the drawings, and SA then used the completed drawings to obtain zoning and/or permits.  *Id.*

7   Subcontractors also used the drawings as blueprints for the physical construction of the upgrade.  *Id.*

8   ¶ 18.  According to Defendant, Plaintiff's redlining was the final review of construction drawings for

9   sites under his management.  *Id.* ¶ 16.

10      In contrast, Plaintiff states that he would simply review the documents for accuracy and

11  stamp the drawings.  Stuckey Decl., Ex A (Federico Depo.) at 38:4-10, Dkt. No. 35.  Plaintiff states

12  that he did not need special education or experience to perform the redlining duties, just limited

13  construction knowledge.  *Id.* at 38:11-24.  While he used construction knowledge in redlining, he

14  also points out that redlining is a duty performed by entry level FCMs, not exclusively by LCMs.

15  *Id.* at 39:3-6.  In his deposition, Plaintiff described redlining as, "I would look through blueprints,

16  give my opinion of what I thought looked correct, what looked out of sorts."  Dkt. No. 29, Ex. E

17  (Federico Depo.) at 38:4-10.  Plaintiff testified that he redlined using his construction knowledge,

18  and his qualifications came from the "school of hard knocks."  *Id.* at 38:15-16, 39:3-6.  As part of

19  redlining, Plaintiff performed research on Siterra,[2] a Sprint-leased nationwide database of cell site

20  histories, in order to develop information about particular sites.  JSUF ¶ 4; Kline Decl. ¶ 21.

21      2.   Tracker

22      Plaintiff's research on Siterra was used to develop information for the tracker, a complex

23  Excel spreadsheet used by Defendant to coordinate the construction process with Samsung and

24  Sprint.  Dkt. No. 29, Ex. E (Federico Depo.) at 46:1-8; Kline Decl. ¶ 30.  The tracker lists

25  information for each of the 1,200 sites, including: the site number, milestones, the LCM's forecasts

26  _____

27      [2]  Siterra contains extensive information about each cell site, including notes, leases,
    photographs, and construction drawings from previous equipment installations.  Kline Decl. ¶ 21.

28

1    for when milestones would be accomplished, the LCM and FCM responsible for the site,

2    subcontractor information, whether a purchase order request had been made, the purchase order

3    request ("POR"), whether a purchase order had been issued, any out-of-scope work requiring a

4    change order request ("COR"), and any requirements for camouflaging equipment, particularly

5    towers and antennas ("stealthing") among other items. Kline Decl. ¶ 25.

6         To provide information for the tracker, Plaintiff did research on Siterra, which involved the

7    evaluation of documents such as photographs and lease amendment agreements. Dkt. No. 29, Ex. E

8    (Federico Depo.) at 37:5-14, 46:3-6. Prior to October 2011, Plaintiff spent 40%-50% of his time

9    working on the tracker. *Id.* at 44:13-16. From October 2011 on, Plaintiff had between five and eight

10   sites in construction at any given time and spent over 50% of his time working on the tracker. *Id.* at

11   71:25-72:8, 75:5-10.

12        Plaintiff interacted with various vendors, general contractors, and A&E firms in order to

13   obtain information and place the data into the tracker. Stuckey Decl., Ex A (Federico Depo.) at

14   41:19-42:3. Once construction began, he updated the tracker on an hourly basis with information he

15   obtained by talking to A&E, the subcontractors who built the sites, and materials vendors. JSUF ¶ 5.

16   Through the tracker, Plaintiff provided information from Siterra to the contractors, RF engineers,

17   architects, and site acquisition. Dkt. No. 29, Ex. E (Federico Depo) at 47:8-24.

18        Plaintiff testified that, although the tracker was also used for project forecasting and

19   scheduling, he did not forecast as part of his job responsibilities. Stuckey Decl., Ex. A (Federico

20   Depo.) at 46:15-23. He testified that he could only change the forecast dates in the tracker when

21   directed by his supervisor, Russell Mix[3], or the Site Acquisition Manager. *Id.* at 225:3-14. Plaintiff

22   directs the Court's attention to the testimony of his fellow LCM, Mitchell Smith, who testified that

23   he had no accountability for inputting information in the tracker that would be used to schedule the

24   entire construction of any given site, and that he had no responsibility over the accuracy of the dates

25

26        ———————————

27        [3]  Russell Mix began working for Defendant as an FCM on the same day as Plaintiff, on
     August 8, 2011. Kline Decl. ¶ 31. In early October 2011, Defendant promoted Mix to RCM for the
     Bay Area, which made him Plaintiff's supervisor. *Id.* ¶ 32.

28

                                             5

UNITED STATES DISTRICT COURT
For the Northern District of California

for a given site as input into the tracker.  Stuckey Decl., Ex B (Smith Depo.) at 85:4-16, 86:7-10.

However, Mix testified that once construction began, LCMs were responsible for the tracker,

including all updates and reports.  Stuckey Decl., Ex. G (Mix Depo.) at 98:19-100:24.

### 3.    Site Walks

A third component of the Plaintiff's LCM position was performing site walks and site visits.

During the first eight weeks of his employment as a FCM, Plaintiff testified that he spent

approximately 20% percent of his time in the field performing site walks.  Stuckey Decl., Ex. A

(Federico Depo.) at 56:16-19.  Starting in October 2011, Plaintiff testified that he spent 15% of his

time in the field, including site walks.  *Id.* at 76:16-77:10; 80:6-15.  During these visits, Plaintiff

would evaluate construction as it happened, ask questions of workers as to why they were doing

things a certain way, and, on at least one occasion, suggest things to be done in a different way than

had already been approved.  *Id.* at 78:19-80:2.

### 4.    Bidding Duties / Change Orders

Plaintiff argues that he performed a basic and limited role in the bidding and change order

process, and that he exercised no independent discretion or judgment in completing these tasks.

Opp'n at 9.  Defendant preselected all subcontractors.  Stuckey Decl., Ex A (Federico Depo.) at

62:1-4.  Once a subcontractor was on site, Plaintiff testified that he was at no time required to

negotiate with a general contractor and it was "extremely rare" for him to negotiate prices with a

subcontractor.  *Id.* at 60:18-23, 244:7-11.  Plaintiff states that, although he initially gathered the

necessary information for a bid and passed it on directly to Samsung, that changed when Mix

became his immediate supervisor, because Mix required Plaintiff to submit all bids through him.  *Id.*

at 83:15-84:12.  Plaintiff also testified that he never challenged contractors on change orders.  *Id.* at

244:12-15.  Once Mix became supervisor, Plaintiff testified that he "micromanaged" all approvals

and that "[w]e were not allowed to approve anything."  *Id.* at 101:21-102:13.

### 5.    Meetings

Plaintiff also attended meetings as a LCM.  Plaintiff testified that he spent approximately

15% of his time in meetings.  *Id.* at 80:16-19.  Plaintiff states that his role in these meetings was

6

1   limited – he was required to listen to others, update the new forecast provided from the site

2   acquisition manager, and gather information to update the tracker.  *Id.* at 81:6-13.

3   **C.      Plaintiff's Complaints and Leave of Absence**

4             **1.      Complaints Regarding Overtime**

5             Plaintiff alleges that he began to complain to Defendant in the Fall of 2011 that he was

6   working long hours each day and not receiving overtime compensation.  FAC ¶ 11.  Plaintiff

7   believes he is a whistle blower because he put his complaint regarding overtime in an email to upper

8   management about long hours without pay.  JSUF ¶ 7.  He did not report Defendant's alleged

9   violations to any state or federal agency.  *Id.* ¶ 8.

10            As of October 24, 2011, Plaintiff understood that he was a salaried employee, and that OCI

11  would not pay him overtime.  *Id.* ¶ 6.  Plaintiff testified that he first started putting overtime down in

12  November.  Stuckey Decl., Ex. A (Federico Depo.) at 103:7-10.  On December 7, 2011, Mix asked

13  upper management for advice regarding Plaintiff listing overtime on his time sheet.  Azrael Decl.,

14  Ex. H-2.  Paul Lindsay instructed Mix to explain to Plaintiff that he was an exempt employee.  *Id.* at

15  H-1.

16            **2.      Complaints Regarding Russell Mix**

17            At his deposition, Plaintiff testified that he initially liked working under Mix, but his

18  complaints about overtime pay caused Mix to change his attitude toward Plaintiff.  Dkt. No. 29, Ex.

19  E (Federico Depo.) at 180:5-20.  He described Mix's attitude as "You own your sites, make it

20  happen."  *Id.* at 58:14-15.  Mix testified that Plaintiff would hand in work that had the wrong dates

21  and wrong notes, and that he "couldn't perform minor functions that everyone else did, let alone the

22  complicated ones."  *Id.*, Ex. G (Mix Depo) at 49:21-51:1, 83:22-84:2.  Plaintiff complained about

23  Mix, specifically that he required the LCMs to work overtime and that Mix raised his voice when

24  speaking to other employees.  Dkt. No. 29, Ex. E (Federico Depo.) at 124:9-12.  Plaintiff's

25  complaints about Mix were "not official."  JSUF ¶ 9.

26            Charles Kline, Defendant's Construction Operations Manager, admits that Mix's "forceful

27  personality caused problems, particularly with Federico."  Kline Decl. ¶ 31.  Kline demoted Mix to

28

UNITED STATES DISTRICT COURT
For the Northern District of California

7

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Assistant RCM on February 10, 2012.  JSUF ¶ 10.  Kline temporarily became Defendant's RCM for

2   the San Francisco Bay Area, until Edmund Tonner took over the position.  JSUF ¶ 10; Kline Decl. ¶

3   31.  Tonner treated Plaintiff respectfully and gave Plaintiff any help he needed.  JSUF ¶ 19.  Mix

4   continued to work in Tonner's office as Assistant RCM and ultimately resigned on June 15, 2012.

5   Kline Decl. ¶ 31.

6           3.      Leave of Absence

7           On February 9, 2012, Kline scheduled meetings for Monday, February 13, with all LCMs to

8   review the status of their sites.  Kline Decl. ¶ 32; Ex. I.  Prior to their meeting, Plaintiff took a

9   medical leave of absence and did not return to work until April 26, 2012.  *Id.* ¶ 32.  During his leave,

10  Plaintiff's doctor told him to relax.  Dkt. No. 29, Ex. E (Federico Depo.) at 160:4-12.  He also took a

11  road trip with one of his brothers and looked for a new job.  *Id.* at 160:16-19, 241:10-11; JSUF ¶ 11.

12  **D.      Special Projects Assignment**

13          When Plaintiff returned from leave, Tonner was his RCM.  JSUF ¶ 12.  During Plaintiff's

14  leave, Tonner hired a new LCM to manage Plaintiff's sites.  Kline Decl. ¶ 33; Tonner Decl. ¶ 3.

15  Mix was then Tonner's assistant, although Plaintiff and Mix did not speak to each other.  Dkt. No.

16  29, Ex. E (Federico Depo.) at 175:7-16.

17          Tonner assigned Plaintiff to the position of LCM in charge of Special Projects, which were

18  upgrades of wireless infrastructure for high level, high priority clients such as Google, Apple, and

19  Hewlett-Packard.  Tonner Decl. ¶ 4; Dkt. No. 29, Ex. E (Federico Depo.) at 165:5-166:2.   While

20  Plaintiff worked on Special Projects, Defendant provided him with a company car and paid for gas.

21  JSUF ¶ 14.  There were 19 Special Projects sites; Plaintiff worked on six to eight of them while he

22  was LCM for Special Projects.  Tonner Dec. ¶ 4.  Special Project sites are similar to conventional

23  cell sites, except that they required about two-thirds of the work because Defendant was not

24  responsible for the antennas, which were already in place.  *Id.* ¶¶ 5-6.  Tonner states that he assigned

25  Plaintiff to Special Projects because he needed someone to manage them, he wanted to keep Plaintiff

26  and Mix separated, he thought Plaintiff was suited to the position and would find managing 6-8 sites

27  less stressful than 250.  *Id.* ¶ 7.

28

8

While Plaintiff worked on Special Projects, he stayed in hotels at Defendant's expense and was allowed to charge meals to Defendant when staying at a hotel. JSUF ¶ 15. Plaintiff followed Tonner's instructions not to work more than eight hours per day. Dkt. No. 29, Ex. E (Federico Depo.) at 168:7-11. He worked "at least 15" hours per day before he went on leave, and worked "at least" seven hours per day less while on Special Projects. *Id.* at 170:14-20; JSUF ¶ 16. Plaintiff spent up to three or four days per week on site in the South Bay. Dkt. No. 29, Ex. E (Federico Depo.) at 172:16-18. The rest of the time he worked in the Walnut Creek office. *Id.* at 173:15-17. Tonner treated Plaintiff "very respectfully," and gave him any help he needed. *Id.* at 174:21-24; JSUF ¶ 19. When Plaintiff asked for help, Defendant assigned Stephen Jackson to be his FCM and assistant. Dkt. No. 29, Ex. E (Federico Depo.) at 188:6-15. Tonner heard no complaints from Sprint about Plaintiff, nor from Plaintiff regarding the assignment. Tonner Decl. ¶ 10. He considered Plaintiff's performance to be average. *Id.*

Plaintiff felt that the Special Projects position was one of the least desirable in the industry and that no one wanted to be placed in it. Stuckey Decl., Ex. A (Federico Depo.) at 166:13-167:4. He testified that Defendant placed him in a position that was outside his abilities and for which he was never trained. *Id.* at 188:2-5, 211:7-11. Plaintiff thought the Special Projects assignment was intolerable because it forced him to interface with high-end clients like Google and Hewlett-Packard without special training; he thought he was set up to fail. Dkt. No. 29, Ex. E (Federico Depo.) at 187:24-188:5.

**E.   Resignation and New Job**

Plaintiff quit without notice on June 1, 2012. JSUF ¶ 23. He testified that he did not give notice because he was "just frustrated" with his position. Dkt. No. 29, Ex. E (Federico Depo.) at 176:5-14. No one was rude to him, or called him names. *Id.* at 199:22-24; JSUF ¶ 20. He had not spoken to Tonner or Kline regarding his concerns. Dkt. No. 29, Ex. E (Federico Depo.) at 177:2-10; JSUF ¶ 24. Plaintiff submitted a claim for $308 in reimbursements when he quit. Dkt. No. 29, Ex. K (Pl.'s Resp. to Interrog. No. 23). At his deposition, Plaintiff stated that he could not remember what the reimbursements were for and that he did not keep a copy of his request. *Id.*, Ex. E

1    (Federico Depo) at 191:13-192:9.

2         Plaintiff received a job offer from Bechtel "right before" he quit. *Id.* at 241:12-14; JSUF ¶

3    21. He started his job a week later. Dkt. No. 29, Ex. E (Federico Depo.) at 197:21-24; JSUF ¶ 22.

4    Bechtel paid Plaintiff $45 per hour, plus overtime at time-and-a-half. Dkt. No. 29, Ex. E (Federico

5    Depo.) at 352:13-24. He put in an average of at least 20 hours of overtime per pay period. *Id.* at

6    352:25-353:3. His pay at Bechtel exceeded his pay at Overland. *Id.* at 353:4-11.

7    **F.    Procedural Background**

8         On April 20, 2012, Plaintiff filed a complaint against Defendant in Contra Costa County

9    Superior Court. Not. of Rem., Dkt. No. 1. Defendant removed the case to this Court on May 18,

10   2012 (Dkt. No. 1), and Plaintiff subsequently filed the operative FAC (Dkt. No. 21). In his FAC,

11   Plaintiff brings the following causes of action: (1) failure to pay overtime under California Labor

12   Code sections 510 and 1194; (2) failure to pay minimum wage under Labor Code section 1194 and

13   1194.2; (3) failure to pay wages under Labor Code section 204; (4) failure to comply with

14   employment wage statement and record provisions under Labor Code section 226(a) and 1174; (5)

15   unlawful business practices under California Business & Professions Code section 17200; (6)

16   retaliation under Labor Code section 1102.5; (7) statutory waiting time penalties under Labor Code

17   section 202; (8) constructive discharge in violation of public policy; and (9) failure to indemnify for

18   business expenses under Labor Code section 2802. *Id.*

19        On August 1, 2013, Defendant filed the present Motion for Summary Judgment, arguing that

20   there is no genuine issue as to any material fact, that it properly classified Plaintiff as exempt from

21   the overtime provisions of the California Labor Code, that it did not retaliate against Plaintiff for his

22   alleged whistle blowing activities, that it did not constructively discharge him, and that it did not fail

23   to reimburse him for business expenses. Mot. at 1-2. In the alternative, Defendant moves for partial

24   summary judgment on the issues of whether Plaintiff is entitled to: (1) overtime compensation

25   because he was properly classified as an exempt employee under Labor Code section 515; (2)

26   liquidated damages under Labor Code section 1194.2 for the failure to pay a minimum wage; (3)

27   damages under Labor Code section 204 for the failure to pay wages; (4) damages under Labor Code

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

section 226(a) or Labor Code section 1174 for failure to comply with employment wage statement and record provisions; (5) damages under Labor Code section 202 for statutory waiting time penalties; (6) damages for unlawful business practices; (7) damages under Labor Code section 1102.5 because Defendant did not retaliate against him for allegedly protected activities; (8) damages for constructive discharge in violation of public policy because Defendant did not subject him to working conditions that were so intolerable that a reasonable person in Plaintiff's position would be compelled to resign; and (9) damages under Labor Code section 2802 because Defendant did not fail to indemnify him for business expenses. *Id.* at 2.

In response, Plaintiff argues that he was not properly classified as exempt because his duties as FCM and LCM did not involve the performance of work directly related to Defendant's management policies or general business operations. Opp'n at 11-13. Plaintiff further argues that the positions did not require the exercise of discretion and independent judgment. *Id.* at 13-14. Plaintiff further argues that Defendant is not entitled to summary judgment as to his retaliation claim because, after he complained internally about overtime issues, his workplace environment allegedly changed, including his failure to receive a promotion and his supervisor, Russell Mix, turning increasingly hostile. *Id.* at 16. As to his constructive discharge claim, Plaintiff argues that his reassignment to Special Projects was a demotion, and that Defendant placed him in a position that was outside his abilities, setting him up for failure. *Id.* at 17-18.

## LEGAL STANDARD

Summary judgment is appropriate only when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears both the initial burden of production as well as the ultimate burden of persuasion to demonstrate that no genuine dispute of material fact remains. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party meets its initial burden, the nonmoving party is required "to go

1    beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories,

2    and admissions on file, designate specific facts showing that there is a genuine issue for trial."

3    *Celotex*, 477 U.S. at 324 (internal quotations and citations omitted). The non-moving party may not

4    rely on the pleadings alone, but must present specific facts creating a genuine issue of material fact

5    through affidavits, depositions, or answers to interrogatories. Fed. R. Civ. P. 56(c); *Celotex*, 477

6    U.S. at 324.

7        The Court must view the evidence in the light most favorable to the nonmoving party.

8    *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If a reasonable

9    jury could return a verdict in favor of the nonmoving party, summary judgment is inappropriate.

10   *Anderson*, 477 U.S. at 248. However, unsupported conjecture or conclusory statements are

11   insufficient to defeat summary judgment. *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th

12   Cir. 2008). Moreover, the court is not required "to scour the record in search of a genuine issue of

13   triable fact," *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted), but rather

14   "may limit its review to the documents submitted for purposes of summary judgment and those parts

15   of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d

16   1026, 1030 (9th Cir. 2001).

                                    **DISCUSSION**

17

18   **A.    Overtime**

19       In his first cause of action, Plaintiff alleges that Defendant failed to compensate him for

20   overtime hours worked, despite working shifts of more than eight hours per day and more than 40

21   hours per week. FAC ¶¶ 19-20. Plaintiff alleges that Defendant followed a policy and practice of

22   classifying and treating him as an exempt employee, despite the fact that it failed to employ him in

23   an administrative, executive or professional capacity as those terms are defined by applicable law.

24   *Id.* ¶ 18.

25       In its Motion, Defendant argues that Plaintiff was properly classified as an exempt employee

26   because: (1) his duties involved non-manual work directly related to the management or general

27   business operations of Defendant and its client; (2) he regularly exercised discretion and

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

independent judgment with regard to matters of significance; (3) he performed, under general supervision only, specialized or technical work that requires special training, experience, or knowledge; (4) he performed administrative duties more than half of the time; and (5) it paid him a salary well over minimum wage.  Mot. at 15-23.

In response, Plaintiff argues that the tasks he performed did not require him to use independent judgment and discretion and, even if they could be considered tasks that required such skills, he did not spend a significant amount of time on them.  Opp'n at 6-10.  Plaintiff further argues that it was upper management that made decisions affecting Defendant's management policies and general business operations, while he had no personal impact.  *Id.* at 11-12.

Under California Labor Code section 510, employers must generally pay mandatory overtime to any employee who works more than eight hours a day or forty hours a week.  Cal. Lab. Code § 510(a). However, the Industrial Welfare Commission ("IWC"), a California state agency, may promulgate exemptions from mandatory overtime.  *Id.* § 515(a).  The IWC promulgates these exemptions in "wage orders," state regulations enforced by the California Division of Labor Standards and Enforcement ("DLSE").  The current IWC wage order is Wage Order No. 4-2001, codified at California Code of Regulations title 8, section 11040.  The 2001 Wage Order establishes three overtime exemptions: the professional exemption, the executive exemption, and the administrative exemption.  8 Cal. Code Regs. § 11040(1)(A)(1)-(3).

Here, Defendant argues that Plaintiff was exempt under the administrative exception.  Mot. at 15.  To exempt an employee under the administrative exemption, an employer must establish five elements:

1. The employee performs work "directly related to management policies or general business operations" of either the employer or the employer's clients;

2. The employee "customarily and regularly exercises discretion and independent judgment";

3. The employee works "under only general supervision" while either: (1) performing work along specialized or technical lines requiring special training, experience, or knowledge, or (2) executing special assignments and tasks;

4. The employee is "primarily engaged" in exempt work meeting the above

13

1        requirements; and

2        5.      The employee meets a minimum salary requirement.

3    *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 830-31 (9th Cir. 2011); 8 Cal. Code

4    Regs. § 11040(1)(A)(2).  Further, the administrative exemption extends to "all work that is directly

5    and closely related to exempt work and work which is properly viewed as a means for carrying out

6    exempt functions."  8 Cal. Code Regs. § 11040.1(A)(2)(f).

7        Wage Order 4-2001 expressly incorporates certain FLSA regulations effective as of the date

8    that wage order was issued.  "The activities constituting exempt work and non-exempt work shall be

9    construed in the same manner as such terms are construed in the following regulations under the Fair

10   Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201-05, 541.207-

11   08, 541.210, and 541.215."  *Campbell*, 642 F.3d at 831.  In other words, in applying Wage Order 4-

12   2001, "just as the [labor] statute is understood in light of the wage order, the wage order is construed

13   in light of the incorporated federal regulations."  *Harris v. Superior Court*, 53 Cal. 4th 170, 178-79

14   (2011).  Thus, the question is whether Plaintiff's work as a construction manager is encompassed by

15   the administrative exemption as construed in accordance with the relevant statute, wage orders, and

16   federal regulations.  *Id.* at 179.

17       The question of whether Plaintiff is an administrative employee exempt from overtime

18   coverage is a mixed question of law and fact.  *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785,

19   794 (1999).  The issue of what Plaintiff did as an employee for Defendant is a question of fact, while

20   the precise scope of the exemptions is a question of law.  *Id.*  Exemptions from statutory mandatory

21   overtime provisions are to be narrowly construed, and Defendant bears the burden of proving the

22   exemption is proper.  *Id.* at 794-95.  Finally, "in resolving whether work qualifies as administrative,

23   courts must consider the particular facts before them and apply the language of the statutes and wage

24   orders at issue."  *Harris*, 53 Cal. 4th at 190.

25       1.      <u>Work Directly Related to Management Policies or General Business Operations</u>

26       Under the first element of the administrative exemption, Plaintiff's work must "directly

27   relate[ ] to management policies or general business operations" of either Defendant or Defendant's

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

14

UNITED STATES DISTRICT COURT
For the Northern District of California

clients. 8 Cal. Code Regs. § 11040(1)(A)(2)(a)(I). Federal Regulations former part 541.205(a) defines the "directly related" phrase as "those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work." 29 C.F.R. § 541.205(a) (2000).[4] The phrase also limits the exemption to persons who perform work of "substantial importance" to the management or operation of the business of his employer or his employer's customers. *Id.*

In the past, some courts have focused their inquiry on whether an employee's work is "directly related" to the administrative operations of a defendant's business by using the "administrative/production dichotomy" test. This test was used to "distinguish[] between[] administrative employees who are primarily engaged in 'administering the business affairs of the enterprise' and production-level employees whose 'primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market.'" *Harris*, 53 Cal. 4th at 183 (discussing how the court below had only focused its inquiry on Federal Regulations former part 541.205(a), which differentiates between administrative and production duties). However, in *Harris*, the California Supreme Court held that in determining whether an employee does work "directly related" to the defendant's administrative operations, courts must do more than simply consider this administrative/production dichotomy. *Id.* at 188. *Harris* held that under Wage Order 4-2001, the incorporated Federal Regulations former part 541.205(a), (b), and (c) must all be read together in order to apply the "directly related" test and properly determine whether the work at issue satisfies the administrative exemption. *Id.* at 188.

Under these incorporated Federal Regulations, "work qualifies as 'directly related' if it satisfies two components. First, it must be qualitatively administrative." *Id.* at 181. Second, quantitatively, it must be of substantial importance to the management or operations of the business. *Id.* Both components must be satisfied before work can be considered 'directly related' to management policies or general business operations in order to meet the test of the exemption. *Id.*

---

[4] All further undesignated section (regulation) references are to title 29 of the Code of Federal Regulations in effect and as incorporated by Wage Order 4-2001.

15

UNITED STATES DISTRICT COURT
For the Northern District of California

1       Federal Regulations former part 541.205(b) discusses the qualitative requirement that the

2   work must be administrative in nature.  *Harris*, 53 Cal. 4th at 182.  It explains that administrative

3   operations includes work done by "white collar" employees engaged in "servicing" a business,

4   including advising management, planning, negotiating, and representing the company.  29 C.F.R. §

5   541.205(b).  Administrative work may also include "purchasing, promoting sales, and business

6   research and control."  29 C.F.R. § 541.205(b).

7       The quantitative prong then explains that an administrative employee's duties are "directly

8   related" to management policies or general business operations only if they are of "substantial

9   importance to the management or operation of the business of his employer or his employer's

10  customers."  29 C.F.R. § 541.205(a); *Harris*, 53 Cal. 4th at 182.  Federal Regulations former part

11  541.205(c) relates to the quantitative component that tests whether work is of "substantial

12  importance."  *Harris*, 53 Cal. 4th at 182.  To satisfy the "substantial importance" test, an employee

13  need not "participate in the formulation of management policies or in the operation of the business

14  as a whole."  29 C.F.R. § 541.205(c).  Rather, employees whose work is "of substantial importance"

15  to the management or operations of a business includes those whose "work affects policy or whose

16  responsibility it is to execute or carry it out.  The phrase also includes a wide variety of persons who

17  either carry out major assignments in conducting the operations of the business, or whose work

18  affects business operations to a substantial degree, even though their assignments are tasks related to

19  the operation of a particular segment of the business."  29 C.F.R. § 541.205(c).

20      Plaintiff's job title as an FCM or LCM is not determinative; rather, the Court must look to

21  the nature of his day-to-day activities.  *Miller v. Farmers' Ins. Exch.*, 481 F.3d 1119, 1125 (9th Cir.

22  2007) (holding that insurance adjusters were exempt administrative employees, despite the fact that

23  they comprised approximately fifty percent of their employer's workforce and did not supervise

24  other employees); *see also,* 29 C.F.R. § 541.201 ("A [job] title alone is of little or no assistance in

25  determining . . . [an employee's status] as exempt or non exempt . . . . Titles can be had cheaply and

26  are of no determinative value").

27      The record contains evidence which could support contrary findings regarding the nature of

28

16

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Frederico's work.  If left uncontradicted, Defendant's evidence could lead to the conclusion that (1)

2    Plaintiff performed white collar work, largely managing a significant portion of Defendant's cell

3    sites himself; (2) he helped plan and advise management on important aspects of preparing the cell

4    site for construction; and (3) his work redlining and using the tracker involved business research and

5    control.  *See* 29 C.F.R. §§ 541.205(a-c).  Such findings could support the ultimate conclusion that

6    Plaintiff's work directly related to management policies and general business operations.

7             On the other hand, Plaintiff's evidence, if accepted as true, could support a finding that he

8    performed only routine clerical duties, reviewing redlines and stamping off on the work already

9    done by other departments, such as A&E.  Dkt. No. 29, Ex. E (Federico Dep.) at 38:4-10; Dkt. No.

10   35, Ex. C (Mix Dep.) at 27:4-25; Dkt. No. 35, Ex. B. (Smith Dep.) at 92:16-93:12.  Like many in the

11   telecommunications construction industry, Plaintiff used Siterra to perform research, and then he

12   used that information to populate the tracker so contractors and others could perform work on the

13   sites.  Dkt. No. 35, Ex. A (Federico Dep.) at 55:17-22; 47:21-24; Dkt. No. 35, Ex. C (Mix Dep.) at

14   29:17-19.  But Plaintiff also argues that the tracker "was basically an Excel spreadsheet in which

15   Defendant stored data to track construction for the various cellular sites."  Opp'n at 7; *see also* Dkt.

16   29, Ex. G. (Mix Dep.) at 10:8-29 ("Q: How about field CMs, did they contribute to the Tracker

17   system? A. . . .  Some lead CMs tried to get a field guy to put the data in.  I instructed them that that

18   was probably not a good idea because most field guys wouldn't know how to open a computer, let

19   alone work an Excel spreadsheet.").  Although the tracker was also used for project forecasting and

20   scheduling, Plaintiff testified that he had no ability to control this forecasting.  Dkt. No. 29, Ex. E

21   (Federico Dep.) at 46:15-23.  Plaintiff argues that he could only change the forecast dates in the

22   tracker when directed by his supervisor, Russell Mix, or the Site Acquisition Manager.  Opp'n at 8;

23   Dkt. No. 35, Ex. A (Federico Dep.) at 225:3-14.  Mitchell Smith also testified that he also had no

24   control or input into the scheduling of construction-related activities on the tracker, nor were LCMs

25   responsible for the accuracy of the scheduling dates in the tracker.  *Id.*, Ex B (Smith Dep.) at 85:4-

26

27

28

17

16, 86:7-10.  Under his version of the facts, Plaintiff essentially performed clerical duties,[5] with no or limited ability to effect the management policies or general business operations of his employer and his employer's clients.

Plaintiff also argues that he rarely negotiated on behalf of Defendant or its clients.  He testified that he was at no time required to negotiate with a general contractor, and it was "extremely rare" for him to negotiate prices with a subcontractor.  Stuckey Decl., Ex A (Federico Dep.) at 60:18-23, 244:7-11.  The only time Plaintiff would be required to challenge the price provided by a contractor was when instructed by the client or his supervisor, Russell Mix.  *Id.* at 61:15-20.  And even when he did contact these general contractors to question their provided prices, Plaintiff testified that his interaction with them was limited and contingent on approval from the client and Mix.  *Id.* at 61:5-8.  Plaintiff's description of these interactions and duties creates a question of material fact as to the degree he was engaged in servicing the Defendant's business.

Defendant cites *Combs v. Skyriver Commc'ns, Inc.*, 159 Cal. App. 4th 1242 (2008), for the proposition that because Plaintiff's activities directly impacted business infrastructure, he performed work directly related to Defendant's general business operations.  Reply at 8.  But *Combs* is distinguishable because the evidence presented here is not as clear cut.  In *Combs*, the plaintiff, a director of network operations, sought to recover unpaid overtime compensation from Skyriver, a broadband internet service provider, alleging that he was misclassified as an exempt employee.  *Combs*, 159 Cal. App. 4th at 1247.  As director of network operations, Combs was responsible for project management, budgeting, vendor management, purchasing, forecasting, employee management, management of "overseas deployment of wireless data network," management of "the

---

[5] *See* 29 C.F.R. § 541.205(c)(2) ("An employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks.").  *See also,* 29 C.F.R. § 541.205(c)(3) ("If all such a person does, in effect, is to tabulate data, he is clearly not exempt.").  On the other hand, "if such an employee makes analyses of data and draws conclusions which are important to the determination of, or which, in fact, determine . . . policy, clearly he is doing work directly related to management policies or general business operations." 29 C.F.R. § 541.205(c)(3).  It is not clear which of these categories Plaintiff's duties fall under.

integration and standardization of three networks into the Skyriver architecture," and the overseeing

of "day to day Network Operations." *Id.* The court held that Combs was properly classified as

exempt because his duties were directly related to the management or general business operations

because "'they directly related to assisting with the running or servicing of the business' . . . and his

work included 'budgeting,' 'purchasing,' 'procurement,' and 'computer network, internet and

database administration.'" *Id.* at 1264-65. The court noted that Combs was responsible for

maintaining, developing and improving Skyriver's network, and his duties involved high-level

problem solving, preparing reports for Skyriver's board of directors, capacity and expansion

planning, planning for the integration of acquired networks into Skyriver's network, lease

negotiations, and equipment sourcing and purchasing. *Id.* at 1264. In contrast, the evidence in this

case is questionable as to whether Plaintiff was responsible for such high-level problem solving and

preparing reports for upper management, let alone that he was responsible for budgeting,

purchasing, procurement, lease negotiations, or capacity and expansion planning.

　　　　　Although not binding, the Court also finds the reasoning of the following case law

persuasive. In *McCullough v. Lennar Corp.*, 2011 WL 1585017, at *17 (S.D. Cal. Apr. 26, 2011),

the court found that summary judgment on the issue of exemption was inappropriate where the

plaintiff, an area manager for a company in the business of residential new home construction,

presented evidence that his primary duties involved tasks as a production employee out in the field

implementing the schedule or duties that were given to him by the corporate office. The defendant

presented evidence that the plaintiff managed all the subcontractors who were building a reservoir,

coordinated with outside teams (including archaeologists, biologists, and city officials), worked with

project management, and saved the defendant $5 million by coming up with a design that the

defendant used as part of the construction. *Id.* at 16. Part of the plaintiff's job as area manager was

determining the order and priority of the horizontal construction activities, leading weekly meetings

with subcontractors and project managers, reviewing the budget, interacting and meeting with city

officials related to obtaining necessary inspection approvals, approving subcontractors invoices for

payment, and reviewing change orders. *Id.* In opposition, the plaintiff argued that he was a

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   production employee and that every week he would attend a meeting where the schedule was

2   readjusted, and the following week he would implement the new schedule. *Id.* at 17. The court

3   found that, based on the defendant's version of the facts, it could be said that the plaintiff's primary

4   duty was the performance of work directly related to the management or general business

5   operations; "however, Plaintiff's facts show that his primary duties involved tasks as a production

6   employee out in the field implementing the schedule or duties that were given to him by the

7   corporate office." *Id.* The court found that this created a disputed issue of material fact as to the

8   plaintiff's primary duties and that, even if the plaintiff was well qualified as an area manager, had

9   extensive past experience, and the defendant appeared to utilize and follow his recommendations on

10  key business operations, it was not clear whether his primary work duties involved work directly

11  related to the management or general business operations of the defendant.

12          The same is true here, where, despite Plaintiff's past experience, it is not clear that his

13  primary work consisted of those types of activities relating to the administrative operations of

14  Defendant's business. As shown above, Defendant has presented evidence which tends to show that

15  Plaintiff's duties were directly related to Defendant's general business, yet Plaintiff has presented

16  evidence that tends to show he was a production employee that implemented the schedule and duties

17  given to him by upper management.

18          Likewise, in *Gottlieb v. Const. Srvs. & Consultants, Inc.*, 2006 WL 5503644, at *6 (S.D. Fla.

19  July 24, 2006), the court held that the plaintiff, as project supervisor for a company engaged in the

20  business of constructing shells for houses, was not an exempt employee. The business involved the

21  use of subcontractors for every phase and the project supervisors' job was to schedule the

22  subcontractors, order supplies, bill on his construction site, be the company's representative on the

23  construction site, and inspect the work of the subcontractors. *Id.* at 1-2. However, the plaintiff was

24  not responsible for hiring or interviewing subcontractors, and the area manager was generally

25  present on the construction site each a time a new model was built and made any changes to the

26  quantity of supplies needed. *Id.* at 2. If the area manager was not present, the plaintiff was expected

27  to make these changes. *Id.* The plaintiff was also responsible for safety on the construction site. *Id.*

28

20

1   at 3.  The court explained that the "[p]laintiff's work involved producing the product CSCI existed

2   to market rather than servicing CSCI itself." *Id.* at 6.  As the plaintiff worked on the production end

3   of the employer in ensuring the shells were built in a timely manner, the court found that his primary

4   work was not directly related to the management or general business operations of the employer or

5   the employer's customers.  *Id.*

6          Similarly, in *Cotten v. HFS–USA, Inc.*, 620 F. Supp. 2d 1342, 1353 (M.D. Fla. 2009), the

7   court found that the defendant had not met its burden of establishing that the plaintiff was an

8   administrative employee.  The plaintiff was a field supervisor for the defendant, a provider of home

9   finishing services, such as installation of tile and hardwood flooring, carpet, decorative trim and

10  molding, and exterior stone and pavers to residential builders.  *Id.* at 1344.  Although the plaintiff

11  managed certain assigned installation sites, his duties were to ensure "the installers received their

12  work orders, retrieved the correct materials from the warehouse, and completed the installation job

13  as specified in the contract and the work order and in compliance with specified standards."  *Id.* at

14  1348.  The plaintiff was not responsible for negotiating or executing contracts, creating work orders

15  or developing the applicable standards; did not perform duties related to financing, budgeting,

16  accounting, auditing, research, employee benefits, taxes, insurance, advertising or computer

17  technology; and was not involved in formulating business policies or procedure.  *Id.*  Thus, the court

18  concluded that the plaintiff's primary duties were not directly related to the management or general

19  business operations of the defendant.  *Id.* at 1350.

20         Given the similar factual issues here, the Court finds that a genuine dispute remains as to

21  whether  the work Plaintiff performed qualified as administrative duties directly related to

22  Defendant's management policies or general business operations.  *See* 8 Cal. Code Regs §

23  11040(1)(A)(2)(a)(1).  Likewise, it is not clear whether Plaintiff's work was of substantial

24  importance to Defendant's business operations.  Accordingly, the Court cannot find as a matter of

25  law that Plaintiff's duties qualify as qualitatively and quantitatively administrative, and summary

26  judgment is therefore inappropriate.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

2.     Discretion and Independent Judgment

Even if the Court were to find that Defendant met its burden as to the first prong of the analysis, the Court finds that a genuine issue of material fact exists as to whether Plaintiff customarily and regularly exercised discretion and independent judgment.  With his responsibility for the upgrade of 250 cell sites, Defendant argues that Plaintiff "made hundreds of judgment calls that affected the cost, quality, and schedule of the Project."  Mot. at 19.  Defendant further argues that many of the problems Plaintiff solved were unprecedented, because the Samsung equipment was entirely new.  *Id.*  In response, Plaintiff argues that he did not exercise discretion because he was controlled by upper management and closely supervised.  Opp'n at 14.

The "exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.207(a).  The phrase "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance."  *Id.*  The determination of whether an employee exercises discretion and independent judgment is based on an evaluation of the totality of the facts involved in the particular employment situation.  29 C.F.R. § 541.207(b).  Federal Regulation former part 541.207(b) provides additional interpretive guidance regarding the phrase "exercise of discretion and independent judgment with respect to matters of significance":

> The term must be applied in the light of all the facts involved in the particular employment situation in which the question arises. It has been most frequently misunderstood and misapplied by employers and employees in cases involving the following: (1) Confusion between the exercise of discretion and independent judgment, and the use of skill in applying techniques, procedures, or specific standards; and (2) misapplication of the term to employees making decisions relating to matters of little consequence.

Subpart (d) of the same regulation further explains that "the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence."  29 C.F.R. § 541.207(a).  But this requirement does not necessarily imply that the employee's decisions must have a finality that goes with unlimited authority and a complete absence of review.  29 C.F.R. § 541.207(e).  Instead, the employee's exercise of discretion

22

UNITED STATES DISTRICT COURT
For the Northern District of California

1   and independent judgment may consist of recommendations for action rather than the actual taking

2   of action.  *Id.*  Finally, an exempt administrative employee must exercise discretion and independent

3   judgment "customarily and regularly," a requirement that is met by the employee who "normally

4   and recurrently" is called upon to exercise discretion and independent judgment in the day-to-day

5   performance of his duties, but not by only the "occasional exercise" of discretion or independent

6   judgement.  29 C.F.R. § 541.207(g).

7        Here, having evaluated the totality of the facts presented by both parties, the Court finds that

8   genuine issues of material fact exist as to whether Plaintiff exercised discretion and independent

9   judgment.  It is undisputed that Plaintiff managed the upgrades of 250 cell sites, about a fifth of

10  Defendant's sites in the Bay Area.  Kline Dec. ¶ 14; Dkt. No. 29, Ex. E (Federico Dep.) at 45:1-10.

11  It is also undisputed that Plaintiff utilized his construction knowledge to redline construction

12  drawings – evaluating the drawings and giving his opinion of what he "thought looked correct" and

13  "what looked out of sorts."  Dkt. No. 29, Ex. E (Federico Dep.) at 38:4-10, 39:3-5.  Defendant has

14  presented evidence that each site had unique characteristics and posed unique problems.  Kline Decl.

15  ¶ 10.  Based on this, Defendant argues that Plaintiff had to use his knowledge and experience to

16  evaluate the drawings and how well they worked for each site.  Mot. at 20.  It is also undisputed that

17  Plaintiff updated the tracker on an hourly basis, often through his interactions with vendors, general

18  contractors, and A&E.  Stuckey Decl., Ex A (Federico Dep.) at 41:19-42:3; Dkt. No. 29, Ex. E

19  (Federico Dep.) at 41:19-42:3; JSUF ¶ 5.  Defendant argues that Plaintiff was expected to "own" his

20  sites and ensure that the tracker contained all relevant information in real time.  Mot. at 21; Ex. G

21  (Mix Dep.) at 108:8-13.

22       In response, Plaintiff argues that he worked under the immediate supervision of the RCM

23  and that upper management kept him "on a short leash."  Opp'n at 13.  Plaintiff argues that

24  reviewing documents created by professionals in other departments required no measurable decision

25  making and independent judgment.  *Id.*  Plaintiff further argues that upper management determined

26  the scope of the tracker and what information he needed to place in the system.  *Id.*  As discussed

27  above, Plaintiff has presented evidence that he would simply "stamp the drawings" and that he did

28

23

1   not need special education or expertise to perform redlining duties. Dkt. No. 29, Ex. E (Federico

2   Dep.) at 38:4-39:14; Opp'n at 6. The testimony of Mitchell Smith corroborates his testimony.

3   Smith Dep. at 92:16-93:12. Plaintiff testified that he had absolutely no ability to control forecasting,

4   and Smith also testified that he also had no control or input into the scheduling of construction-

5   related activities on tracker, nor were LCMs responsible for the accuracy of the scheduling dates in

6   the tracker. Dkt. No. 29, Ex. E (Federico Dep.) at 46:15-23; Stuckey Decl., Ex B (Smith Dep.) at

7   85:4-16, 86:7-10. The discussion in 29 C.F.R. § 541.207(c)(1) illuminates the problem with the

8   conflicting representations of Plaintiff's duties, noting that "[p]erhaps the most frequent cause of

9   misapplication of the term 'discretion and independent judgment' is the failure to distinguish it from

10  the use of skill in various respects." *Id.*; *see also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120,

11  1129 (9th Cir. 2002) (warning against "ignor[ing] the regulations' distinction between the use of

12  discretion and the application of skill."). In *Phase Metrics*, Bothell worked as a field service

13  engineer, installing, troubleshooting, and maintaining Phase Metrics' products. *Id.* at 1122-23.

14  Phase Metrics argued that, as a field inspector operating away from his supervisor in a remote

15  location, Bothell necessarily exercised discretion and independent judgment. *Id.* at 1129. The

16  Court, however, found that there were genuine issues of fact regarding the extent to which the

17  plaintiff was permitted to make decisions and the importance of the decisions over which he had

18  control. *Id.* Even though Bothell's work required specialized knowledge, the Court held that skill is

19  not determinative, and noted that all but the smallest decisions were made by the plaintiff's

20  supervisor. *Id.* As in *Phase Metrics*, there are genuine issues of fact here regarding the significance

21  and independence of the decisions Plaintiff made while redlining, as well as the discretion Plaintiff

22  used in adding and using information related to the tracker.

23          But Defendant argues that redlining required discretion and independent judgment,

24  describing how Defendant expected Plaintiff to "evaluate the drawings and indicate any necessary

25  corrections." Reply at 9. A similar argument was rejected in *Burns v. Blackhawk Mgmt. Corp.*,

26  2008 WL 3822565 (S.D. Miss. Aug. 12, 2008). In *Burns*, the defendant reasoned that plaintiff used

27  "independent judgment" because it relied on his judgment in evaluating the quality of construction,

28

24

but the court rejected this argument, finding the extent of Burns' use of "judgment" was in determining whether the contractor's work conformed to the contract. *Id.* at 4. The court noted that he merely compared the work performed to the contract requirements, and if it did not conform, he notified the project manager. *Id.* For the *Burns* court, these activities did not qualify as the use of "independent judgment" within the contemplation of this exemption. *Id.*

Similarly, Defendant argues that Plaintiff's use of the tracker was an activity requiring discretion and independent judgement. Mot. at 21. However, there is a factual dispute on this issue, with Plaintiff contending that he would "simply obtain information and place the data into the Tracker," (Dkt. No. 29, Ex A (Federico Dep.) at 41:19-42:3), and Defendant arguing that he also evaluated, interpreted, and changed information as necessary, which required discretion and independent judgment (Mot. at 21). Both the Ninth Circuit's finding in *Phase Metrics* above and the related regulations caution against confusing application of skill with discretion and independent judgment: "A typical example of the application of skills and procedures is ordinary inspection work . . . . [I]nspectors rely on techniques and skills acquired by special training or experience. They may have some leeway in the performance of their work but only within closely prescribed limits." 29 C.F.R. § 541.207(c)(2). The regulations acknowledge that "[e]mployees of this type may make recommendations on the basis of the information they develop in the course of their inspections (as for example, to accept or reject an insurance risk or a product manufactured to specifications), but these recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards." *Id.* As a result, "a decision to depart from the prescribed standards or the permitted tolerance is typically made by the inspector's superior." *Id.* In such cases, the inspector is engaged in exercising skill rather than discretion and independent judgment. *Id.* Here, the Court finds there is a factual dispute as to whether Plaintiff's duties are more limited, like those of an inspector, gathering and entering data that upper management used to manage the scheduling and progress of its projects, or whether Plaintiff himself exercised that discretion and independent judgment necessary for the 250 sites he managed.

Further, although Plaintiff may have used his construction knowledge and skill to evaluate

and determine the accuracy of the information transferred from Siterra to the tracker, there remains a dispute about what if any discretion he had in adding that information to the tracker and how that information was later used. Plaintiff characterizes his work as "merely gather[ing] information from third parties and enter[ing] the information into the Tracker." Opp'n at 8. In *Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999), the Fifth Circuit affirmed a jury finding that the administrative exemption did not apply to employees who spent considerable time compiling information to complete their databases, while still being required to get a superior's approval before making any significant decisions. Here, Defendant disputes Plaintiff's "denigrat[ion] of his 'research and data gathering,'" (Mot. at 20), but the question remains as to what extent Plaintiff actually used discretion and independent judgment in his tracker duties. The Court finds that whether Plaintiff "customarily and regularly exercised discretion and independent judgment cannot be ascertained from the existing record" at this phase in the proceedings and should be determined by a jury. *Phase Metrics*, 299 F.3d at 1129; *see also* 29 C.F.R. § 541.207(g).

Defendant argues that Plaintiff's relationship with subcontractors required discretion and independent judgment, as he visited and evaluated sites, compared the sites to construction drawings, and then provided that information to the subcontractors so they could make bids. Reply at 11. Defendant cites *Lopez v. United Parcel Service, Inc.*, 2010 WL 3630619 (N.D. Cal. Sept. 14, 2010), to suggest that this activity of evaluating, suggesting modifications, and explaining information to subcontractors means that Plaintiff "inherently" exercised discretion and independence. Reply at 11. As an initial matter, the *Lopez* opinion is the court's Findings of Fact and Conclusions of Law, issued following a bench trial in the case. *Lopez v. United Parcel Service Inc.*, 2010 WL 3630619, at *1 (N.D. Cal. Sept. 14, 2010). Moreover, when the *Lopez* case was at the same procedural posture as this case, the district court declined to grant the defendant's motion for summary judgement on the issue of whether the plaintiff exercised discretion and independent judgment. *Lopez v. United Parcel Serv., Inc.*, 2010 WL 728205, at *5 (N.D. Cal. Mar. 1, 2010) ("[T]he Court concludes that disputed issues of fact on the discretion and independent judgment element preclude summary judgment."). Thus, the *Lopez* opinions only serve to confirm that

26

summary judgment is not appropriate at this stage, where genuine issues of material fact still remain.

Defendant also cites to *Kennedy v. Commonwealth Edison*, 410 F.3d 365 (7th Cir. 2005), in support of its argument that Plaintiff regularly exercised discretion and independent judgment. In *Kennedy*, the court upheld summary judgment in favor of the employer, a nuclear power plant. The plaintiffs were "work planners" who were "problem solvers" that devised solutions for electrical, mechanical, and instrumentation problems at the plant. *Id.* at 368. The work planner would study the problem and decide what kind of labor, materials, and equipment will be needed for the project. *Id.* The work planners claimed that they did not exercise discretion and independent judgment, because their work place was procedure driven and strictly controlled. *Id.* at 374. The court disagreed, stating, "Certainly no one would contend that a tax lawyer does not exercise discretion or independent judgment just because the Internal Revenue Code contains a highly regimented set of rules." *Id.* at 374-75.

Here, there is at least a dispute of fact as to whether Plaintiff exercised the same level of discretion and independent judgment as the *Kennedy* plaintiffs. Defendant cites to Plaintiff's email correspondence in which he suggested how to mount antennas on a site. Dkt. No. 29, Ex. F-3, F-4. However, these emails do not establish as a matter of law that Plaintiff had the authority to formulate and implement management policies or operating practices. Nor do they show that Plaintiff regularly exercised any such discretion. There are also questions as to whether Plaintiff's decisions at individual sites could be considered major assignments in conducting the operations of Defendant's business and whether his decisions included the authority to commit Defendant in matters that have significant financial impact. An administrative employee must exercise discretion and independent judgment regularly and customarily. 29 C.F.R. § 541.207(g). Even if on occasion Plaintiff exercised some discretion and independent judgment, Defendant has not carried its burden to demonstrate that such activities were normal or recurrent.

Given these factual issues, the Court finds that a genuine dispute exists as to whether Plaintiff regularly exercised discretion and independent judgment in the course of his employment within the meaning of Wage Order 4-2001. Accordingly, from the existing record, the Court cannot

27

1    find as a matter of law that Defendant has satisfied its burden as to this prong of the analysis.

2              3.       General Supervision

3              As to the third element, Defendant must establish that Plaintiff worked "under only general

4    supervision" while either: (1) performing work along specialized or technical lines requiring special

5    training, experience, or knowledge, or (2) executing special assignments and tasks. *Campbell*, 642

6    F.3d at 830-31; 8 Cal. Code Regs. § 11040(1)(A)(2).  In its Motion, Defendant argues that upgrading

7    cell sites with new technology is specialized technical work and, in order to manage the construction

8    of his 250 sites, Plaintiff needed to understand how the equipment worked, how to install it properly,

9    the technical issues that each site presented, as well as the evolving Samsung equipment. Mot. at 22.

10   Defendant further argues that his duties, including obtaining the information for the tracker, required

11   specialized experience. *Id.*  In response, Plaintiff argues that he was controlled by upper

12   management and closely supervised.  Opp'n at 14.  Plaintiff further argues that upper management

13   determined the scope of his duties and projects, while he "was merely a facilitator of information."

14   *Id.* at 13.

15              Where there are the numerous factual disputes in the record, courts should be cautious in

16   disposing of the general supervision issue at summary judgment. *See, e.g.*, *Campbell*, 642 F.3d at

17   831-32.  In *Campbell*, the Ninth Circuit held that it could not "conclude as a matter of law that all

18   unlicensed accountants are necessarily subject to more than general supervision." *Id.* at 832.  The

19   court noted that both parties had introduced substantial evidence about the nature and scope of the

20   defendant's supervision over plaintiffs, and given the "highly contested" issues of fact, the court

21   ultimately determined that "a jury should evaluate credibility and weigh this extensive conflicting

22   evidence." *Id.*; *see also Ho v. Ernst & Young LLP*, 2009 WL 111729, at *5 (N.D. Cal. Jan. 15,

23   2009) (finding that the conflicting evidence in plaintiff's deposition testimony and declarations

24   created a triable issue of material fact as to the amount of supervision given her and the degree of

25   independent judgment plaintiff exercised).  Here, too, as discussed above, the Court finds that

26   numerous factual disputes exist in the record, thus precluding summary judgment.

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

4.      Primarily Engaged in Exempt Work

Under the fourth element, Plaintiff must be "primarily" engaged in duties that qualify under the regulations.  8 Cal. Code Regs. § 11040(1)(A)(2).  The term "'primarily' means more than one-half of the employee's worktime."  Cal. Lab. Code § 515(e).  Thus, "state regulation takes a purely quantitative approach" as to whether an employee is exempt or non-exempt.  *Ramirez*, 20 Cal. 4th at 797.  Pursuant to 8 Cal. Code. Regs. § 11040(1)(A)(2)(f), exempt work includes "all work that is directly and closely related to exempt work and work which is properly viewed as a means for carrying out exempt functions."  *Id.*  "The work actually performed by the employee during the course of the workweek must, first and foremost, be examined and the amount of time the employee spends on such work, together with the employer's realistic expectations and the realistic requirements of the job, shall be considered in determining whether the employee satisfies this requirement."  *Id.*

Here, it is undisputed that Plaintiff spent at least 70% of his time performing redlining and tracker duties.  From August 8, 2011 to early October 2011, Plaintiff spent 30% to 40% of his time redlining and 40% to 50% using the tracker.  JSUF ¶ 3; Dkt. No. 29, Ex. E (Federico Dep.) at 44:12-16.  From October 2011 until February 13, 2012, Plaintiff spent 20% of his time redlining drawings and over 50% of his time managing sites through the tracker.  JSUF ¶ 3; Dkt. No. 29, Ex. E (Federico Dep.) at 71:25-72:4; 75:5-7.  However, as discussed above, the Court finds that genuine issues of material fact exist as to whether these activities are properly classified as exempt.  Accordingly, triable issues exist as to this prong that preclude the entry of summary judgment.

5.      Salary Requirement

Finally, it is undisputed that Plaintiff's monthly salary ranged from $7750.00 to $7905.00.  JSUF ¶¶ 17-18.  An administrative employee must "earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment.  8 Cal. Code Regs. § 11040(1)(A)(2)(g).  Full-time employment is defined in Labor Code section 515(c) as 40 hours per week.  *Id.*  There is no dispute that Plaintiff's salary is more than double the monthly salary of an

1 individual earning California's applicable minimum wage rate of $8.00 per hour.[6]

2       6. <u>Summary</u>

3       Based on the analysis above, the Court finds that Defendant has failed to meet its burden to

4 establish as a matter of law that Plaintiff was properly classified as an exempt employee, and that

5 issues of material fact exist on this issue. Accordingly, the Court DENIES Defendant's Motion as to

6 Plaintiff's first cause of action for overtime under California Labor Code section 510(a).

7 **B.     Failure to Pay Minimum Wage**

8       In his second cause of action, Plaintiff alleges that Defendant failed to pay him the legal

9 minimum wage for all hours he worked in violation of Labor Code section 1194. FAC ¶¶ 23-28.

10 Specifically, Plaintiff alleges that, because his salary only compensated him for regular work hours

11 and days, he received no compensation for hours worked beyond 8 hours per day or 40 hours per

12 week. Azrael Decl., Ex. K (Pl.'s Interrog. Resp. No. 6). Plaintiff also seeks liquidated damages

13 pursuant to section 1194.2. FAC ¶ 24. Defendant argues that this claim must fail because Plaintiff

14 was not entitled to overtime compensation. Mot. at 23. However, as discussed above, the Court is

15 unable to determine at this stage in the proceedings whether Plaintiff was properly classified as an

16 exempt employee. Accordingly, the Court DENIES Defendant's Motion as to this cause of action.

17 **C.     Failure to Pay Wages**

18       In his third cause of action, Plaintiff alleges that Defendant failed to pay him for all hours

19 worked in violation of Labor Code section 204. FAC ¶¶ 29-34. Section 204 governs when

20 employees are to be paid their wages and requires that all wages "earned by any person in any

21 employment are due and payable twice during each calendar month, on days designated in advance

22 by the employer as the regular paydays." Cal. Lab. Code § 204(a). Here, Plaintiff's pay statements

23 show Defendant consistently paid his salary according to the statutory timetable. Azrael Decl., Ex.

24 J. However, they do not show that Defendant paid Plaintiff for all overtime hours he claims to have

25 worked. Defendant again argues that this claim must fail because Plaintiff was not entitled to

---

27      [6] Since January 1, 2008, the state minimum wage has been $8.00 per hour. Cal. Lab. Code §
28 1182.12.

30

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  overtime compensation.  Mot. at 23-24.  However, as discussed above, the Court is unable to

2  determine at this stage in the proceedings whether Plaintiff was properly classified as an exempt

3  employee.  Accordingly, the Court DENIES Defendant's Motion as to this cause of action.

4  **D.      Failure to Comply with Employment Wage Statement and Record Provisions**

5              In his fourth cause of action, Plaintiff alleges that Defendant failed to provide proper pay

6  statements, in violation of Labor Code section 226(a), by failing to itemize the total number of hours

7  Plaintiff worked.  FAC ¶ 36.  Plaintiff also alleges that Defendant failed to maintain proper payroll

8  records, pursuant to Labor Code section 1174.  *Id.* ¶ 37.  Defendant argues that this claim must fail

9  because they kept the appropriate records.  Mot. at 24.  However, as discussed above, the Court is

10 unable to determine at this stage in the proceedings whether Plaintiff was properly classified as an

11 exempt employee, and therefore cannot determine whether Defendant properly itemized Plaintiff's

12 hours and maintained proper payroll records.  Accordingly, the Court DENIES Defendant's Motion

13 as to this cause of action.

14 **E.      Retaliation**

15             In his sixth cause of action for retaliation under Labor Code section 1102.5, Plaintiff alleges

16 that he engaged in a protected activity by "repeatedly reporting, opposing, and objecting to

17 Defendant's failure to adhere to the wage and hour requirements of the California Labor Code and

18 the Federal [*sic*] Standards Labor Act."  FAC ¶ 45.  Based on complaints he made to Defendant's

19 upper management, he alleges that he suffered retaliation, including Defendant's withdrawal of a job

20 promotion, a job demotion, and informing Plaintiff's co-workers that Plaintiff was a whistle blower

21 and causing problems.  *Id.* ¶ 46.

22             Section 1102.5 provides that: "An employer may not retaliate against an employee for

23 disclosing information to a government or law enforcement agency, where the employee has

24 reasonable cause to believe that the information discloses a violation of state or federal statute, or a

25 violation or noncompliance with a state or federal rule or regulation."  Cal. Lab. Code § 1102.5(b).

26 To establish a prima facie case of retaliation under section 1102.5(c), a plaintiff must show: (1) he

27 engaged in protected activity; (2) his employer thereafter subjected him to an adverse employment

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

31

UNITED STATES DISTRICT COURT
For the Northern District of California

1    action; and (3) a causal link between the two. *Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1025

2    (N.D. Cal. 2012); *see also Murray v. Alaska Airlines, Inc.*, 522 F.3d 920, 922 n.2 (9th Cir. 2008)

3    (acknowledging the elements of a prima facie case of retaliation under Cal. Lab. Code § 1102.5 and

4    citing *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 69 (2000)). The California Supreme

5    Court has made clear that section 1102.5 only protects employees who report their concerns to

6    public agencies – the statute does not concern employees who only report their suspicions directly to

7    their own employer. *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 76-77 (1998).

8           Here, Plaintiff has not established that he engaged in protected activity under section 1102.5.

9    In his interrogatory responses, Plaintiff stated that he "reported to management that he was not

10   properly being paid overtime." Azrael Decl., Ex. K (Pl.'s Resp. to Interrog. No. 10). In his

11   deposition, Plaintiff testified that Defendant retaliated after he emailed his complaints and discussed

12   them with upper management. *Id.*, Ex. E (Federico Depo) at 178:14-179:3. However, this does not

13   constitute protected activity for purposes of the statute, because the complaint was not to a

14   government or law enforcement agency. *See e.g.*, *Weingand v. Harland Fin. Solutions, Inc.*, 2012

15   WL 3537035, at *4 (N.D. Cal. Aug. 14, 2012) ("Plaintiff cannot make out a § 1102.5 claim because

16   he does not allege that he reported any suspicions of unlawful activity to any government agency,

17   nor does he allege that he refused to do anything that would violate the law."); *Bursese v. PayPal,*

18   *Inc.,* 2007 WL 485984, at *9 (N.D. Cal. Feb. 12, 2007) ("PayPal contends, and this court agrees, that

19   Cal. Labor Code Section 1102.5(b) does not apply to plaintiff because he only reported his concerns

20   to a private employer, rather than a public agency.") (both citing *Green,* 19 Cal. 4th at 77); *see also*

21   *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1202 (9th Cir. 2000) (citing *Green*, 19 Cal. 4th 66,

22   for the proposition that "reports to private employers not within scope of statute [Cal. Lab. Code §

23   1102.5]."). Thus, Plaintiff has failed to present evidence that he may pursue a claim under section

24   1102.5 for his internal complaints to Defendant.

25          Although Plaintiff's FAC and Opposition only identify his internal complaints as the

26   protected activity that allegedly caused Defendant to retaliate against him, the Court notes that in his

27   Response to Interrogatories, Plaintiff also identified the action of filing this lawsuit as a protected

28

32

UNITED STATES DISTRICT COURT
For the Northern District of California

1    activity.  Azrael Decl., Ex. K (Pl.'s Resp. to Interrog. No. 10).  When asked to list each protected

2    activity Plaintiff engaged in while employed at OCI, Plaintiff responded that he filed a lawsuit on

3    April 20, 2012 against Defendant "for its violations of the California Labor Code."  *Id.*  Neither

4    party addressed the issue of whether Plaintiff's lawsuit itself qualifies as a protected activity.

5    Nevertheless, "courts in this district have uniformly held that claims under section 1102.5 must first

6    be presented to the Labor Commissioner" before a court can consider them.  *Ferretti*, 855 F. Supp.

7    2d at 1024 (citing *Reynolds v. City and Cnty. of San Francisco*, 2011 WL 4808423, at *1 (N.D. Cal.

8    Oct. 11, 2011)); *Carter v. Dep't of Corr.*, 2010 WL 2681905, at *9-10 (N.D. Cal. July 6, 2010);

9    *Sullivan v. Aramark Uniform and Career Apparel, Inc.*, 2011 WL 3360006, at *6 (N.D. Cal. Aug. 3,

10   2011); *Hall v. Apartment Inv. and Mgmt. Co.*, 2008 WL 5396361, at *3-4 (N.D. Cal. Dec. 19, 2008);

11   *Romaneck v. Deutsche Asset Mgmt.*, 2006 WL 2385237, at *6 (N.D. Cal. Aug. 17, 2006).

12          In *Campbell v. Regents of Univ. of Cal.*, the California Supreme Court held that "the rule is

13   that where an administrative remedy is provided by statute, relief must be sought from the

14   administrative body and this remedy exhausted before the courts will act."  35 Cal. 4th 311, 321

15   (2005).  "In *Campbell,* the California Supreme Court expressly held that even though § 1102.5 is

16   silent as to any requirement for administrative exhaustion, 'the past 60 years of California law on

17   administrative remedies' nevertheless compelled the conclusion that a person bringing a claim under

18   the section *is* subject to the exhaustion requirement."  *Reynolds*, 2011 WL 4808423, at *1 (quoting

19   *Campbell,* 35 Cal. 4th at 329) (emphasis in original).  Thus, under *Campbell,* because California

20   Labor Code section 98.7[7] provides Plaintiff an administrative remedy for a violation of section

21   1102.5(b), Plaintiff was required to exhaust that remedy before filing his section 1102.5 claim in

22

23

24          [7] California Labor Code section 98.7, subdivision (a), provides in pertinent part: "Any person
     who believes that he or she has been discharged or otherwise discriminated against in violation of
25   any law under the jurisdiction of the Labor Commissioner may file a complaint with the division
     within six months after the occurrence of the violation."
26

27

28

                                                      33

UNITED STATES DISTRICT COURT
For the Northern District of California

1  federal court.  This conclusion was recently confirmed in *MacDonald v. State*, 219 Cal. App. 4th 67

2  (2013) (finding that plaintiff was required to exhaust his administrative remedies before pursuing his

3  action under section 1102.5).  As Plaintiff has not alleged that he filed a complaint with the Labor

4  Commissioner or took any other steps to exhaust any administrative remedies potentially available

5  him, he may not properly bring a section 1102.5 claim before this Court.

6      Accordingly, the Court finds that Plaintiff fails to demonstrate the existence of a question of

7  fact which would preclude summary judgment on his claim under section 1102.5.  The Court thus

8  GRANTS Defendant's Motion as to Plaintiff's retaliation claim.

9  **F.    Statutory Waiting Time Penalties**

10      In his seventh cause of action, Plaintiff alleges that Defendant failed to pay him within 72

11  hours of resignation, as required by California Labor Code section 202.  FAC ¶¶ 52-56.  Plaintiff

12  maintains that his claim is premised on Defendant's failure to pay him overtime.  Opp'n at 14-15;

13  Azrael Decl., Ex. J (Pl.'s Resp. to Interrog. No. 9).  Defendant argues that this claim must fail

14  because Plaintiff was not entitled to overtime.  Mot. at 25.  However, as discussed above, the Court

15  is unable to determine at this stage in the proceedings whether Plaintiff was properly classified as an

16  exempt employee.  Accordingly, the Court DENIES Defendant's Motion as to this cause of action.

17  **G.    Constructive Discharge**

18      Plaintiff's eighth cause of action is for constructive discharge in violation of public policy.

19  FAC ¶¶ 57-65.  Plaintiff alleges that, because he "engaged in a protective activity by repeatedly

20  reporting, opposing, and objecting to Defendant's failure to adhere to the wage and hour

21  requirements of the California Labor Code and the Federal [*sic*] Standards Labor Act," Defendant

22  "initiated a pattern and practice of retaliating against [him] . . . making Plaintiff's working

23  environment so intolerable that he was constructively discharged on June 1, 2012."  FAC ¶ 61.

24      A "constructive discharge occurs when the working conditions deteriorate, as a result of

25  discrimination, to the point that they become 'sufficiently extraordinary and egregious to overcome

26  the normal motivation of a competent, diligent, and reasonable employee to remain on the job to

27  earn a livelihood and to serve his or her employer.'"  *Brooks v. City of San Mateo*, 229 F.3d 917,

28

34

930 (9th Cir. 2000) (quoting *Turner v. Anheuser–Busch, Inc.*, 7 Cal .4th 1238, 1246 (1994)).  To

prevail on a constructive discharge claim, a plaintiff must show that "when, looking at the totality of

the circumstances, 'a reasonable person in [the plaintiff's] position would have felt that he was

forced to quit because of intolerable and discriminatory working conditions.'" *Watson v.*

*Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (quoting *Satterwhite v. Smith*, 744 F.2d

1380, 1381 (9th Cir. 1984)).  " The inquiry is objective: Did working conditions become so

intolerable that a reasonable person in the employee's position would have felt compelled to

resign?'" *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting *Penn. State Police v.*

*Suders,* 542 U.S. 129, 141 (2004)).  "As a result, the answer turns on the facts of each case."

*Satterwhite*, 744 F.2d at 1382.

     The determination of whether working conditions are sufficiently egregious to support a

constructive discharge theory is usually a jury question.  *Watson*, 823 F.2d at 361.  However, a court

may properly determine that a claim fails as a matter of law when, taking the evidence in the light

most favorable to the plaintiff, allegations are "insufficient as a matter of law to sustain a finding by

a reasonable fact finder that his working conditions were so intolerable and discriminatory that a

reasonable person would feel forced to resign." *Huskey v. City of San Jose*, 204 F.3d 893, 900 (9th

Cir. 2000) (internal citations and quotation marks omitted).  Every job entails frustrations, struggles,

and stress, but in order to properly manage its business an employer must be able to "review,

criticize, demote, transfer, and discipline employees." *Turner*, 7 Cal. 4th at 1247.  Thus, to make out

a constructive discharge claim, adverse conditions must be "extraordinary and egregious,"

"unusually aggravated," or part of a "continuous pattern," such that any reasonable employee would

feel compelled to resign rather than continue the employment relationship under such intolerable

conditions. *Id.* at 1246-48.

     Here, Plaintiff alleges that when he returned from medical leave in April 2012, Defendant

"initiated a pattern and practice of retaliating against Plaintiff," making "Plaintiff's working

environment so intolerable that he was constructively discharged on June 1, 2012." FAC ¶ 59, 61.

Plaintiff alleges that Defendant's purportedly intolerable conduct included demoting him, putting

UNITED STATES DISTRICT COURT
For the Northern District of California

1   him in an undesirable position outside his training and ability, limiting his job duties, no longer

2   providing him with support staff, requiring him to undergo excessive drug testing, terminating his

3   meal expense reimbursement, requiring him to travel longer distances for his commute, and making

4   him feel isolated as he no longer worked on a team. *Id.*; Opp'n at 17-18.

5          Plaintiff cites *Turner* to explain that "constructive discharge occurs when an employer's

6   conduct effectively forces an employee to resign." Opp'n at 17 (citing *Turner*, 7 Cal. 4th at 1244).

7   However, as in *Turner*, even if Plaintiff's "miscellaneous charges of employer misconduct are

8   considered together, no continuous pattern of harassment or aggravating conditions emerges."

9   *Turner*, 7 Cal. 4th at 1255.  In *Turner*, the California Supreme Court clarified that in a constructive

10  discharge claim, "[t]he proper focus is on whether the resignation was coerced, not whether it was

11  simply one rational option for the employee." *Id.* at 1246.  Although Turner had produced evidence

12  indicating that he (1) observed illegal acts which he reported to management; (2) was reassigned to a

13  different position and location in retaliation for that reporting; and (3) was given a low performance

14  rating, the Court concluded that "[n]one of these purported conditions creates a triable issue of

15  material fact" for Turner's constructive discharge claim. *Id.* at 1254.

16         Likewise, here, Plaintiff has presented no evidence that creates a triable issue of material fact

17  that his working conditions were "intolerable" or "aggravated" such that a reasonable person would

18  have felt compelled or forced to resign.  Plaintiff asserts that he was demoted when Defendant

19  assigned him to the "Special Projects" position.  Opp'n at 17.  But there is no evidence that this

20  reassignment was a demotion.  Plaintiff had been an LCM before his leave of absence and was an

21  LCM after his leave.  JSUF ¶ 2, 13.  And as the LCM in charge of Special Projects, Plaintiff worked

22  fewer hours on fewer assignments with better pay.  After returning from his leave of absence for

23  work related stress, Plaintiff worked at least seven hours per day less than he had before his leave

24  (Tonner Decl.¶ 16), managing only 6-8 sites, rather than his previous 250 sites. *Id.* ¶ 7.  Edmund

25  Tonner, Plaintiff's new RCM, explained that he reassigned Plaintiff to the Special Projects position

26  to keep Plaintiff and Russell Mix separated, and because he thought Plaintiff would find managing

27  fewer sites less stressful. *Id.*  And in April 2012, Defendant gave Plaintiff a raise from $7,750.00

28

per month to $7,905.00 per month. *Id.* ¶ 17. Defendant also provided Plaintiff with a company car and paid for gas while he was working on Special Projects. JSUF ¶ 14. Plaintiff stayed in hotels at Defendant's expense and was allowed to charge meals to Defendant while staying at a hotel. *Id.* ¶ 15. When Plaintiff asked for help, Defendant assigned Stephen Jackson to be his FCM and assistant. Dkt. No. 29, Ex. E (Federico Dep.) at 188:6-15. It is undisputed that Tonner treated Plaintiff respectfully and gave Plaintiff any help he needed. JSUF ¶ 19. And while Plaintiff had to take four drug tests while employed with Defendant, the record undermines the conclusion that Plaintiff found the tests "intolerable" as he never complained or questioned the frequency of these tests to his supervisor or upper management. Dkt. No. 35, Ex. A (Federico Dep.) at 214:16-24. Additionally, at his deposition, when asked on two separate occasions to list the conditions that made his working environment intolerable, Plaintiff never once mentions these drug tests. Dkt. No. 29, Ex. E (Federico Depo) at 187-24-188:5; 191:2-7.

There is nothing about the facts Plaintiff alleges that demonstrates his working conditions were "intolerable," "extraordinary," or "egregious" such that a reasonable person would feel compelled or coerced to resign. And even if Plaintiff could show that this reassignment was in some way a demotion, *Turner* counsels that "a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." *Turner*, 7 Cal. 4th at 1247. While the "Special Projects" position may have been less desirable, there is nothing about Defendant's actions that makes Plaintiff's decision to resign forced or compelled. *Cf. Hess v. Madera Honda Suzuki*, 2012 WL 4052002, at *14-16 (E.D. Cal. Sept. 14, 2012) (finding genuine issues of material fact as to whether Plaintiff was constructively discharged after she continued working for Defendant for two years without pay and after being continuously rebuffed in her efforts to obtain compensation). Plaintiff has failed to show that his "job conditions [were] worse than those which a reasonable person could tolerate." *Poland*, 494 F.3d at 1185-86 (reversing the district court's verdict in favor of Plaintiff's constructive discharge claim because Plaintiff's evidence that he was transferred, separated from his family, and demoted, failed as a matter of law to demonstrate that he was constructively discharged) (internal citation and quotations omitted).

UNITED STATES DISTRICT COURT
For the Northern District of California

Instead, as in *Turner*, the undisputed facts demonstrate that Plaintiff's "resignation was voluntary and strategic, not . . . coerced or compelled by [Defendant's] acts." *Turner*, 7 Cal. 4th at 1255. Plaintiff alleges that beginning after he returned from medical leave in late April 2012, Defendant "initiated a pattern and practice of retaliating against Plaintiff," not placing him in the "Market Lead" position as previously promised and culminating with the reassignment to the "Special Projects" position that "eventually forced Plaintiff to resign his position." FAC ¶ 59, 61; Opp'n at 17. Yet, it is undisputed that while he was on leave, Plaintiff was already looking for a new job. JSUF ¶ 11. While Plaintiff's allegations and evidence concerning the conditions that purportedly forced him to resign focus almost exclusively on the actions Defendant took after he returned from leave (*see* FAC at 9-12; Opp'n 16-18), Plaintiff's own testimony reveals that he had already made up his mind to look for new employment before then. Dkt. No. 29, Ex. E (Federico Dep.) at 241:8-11 ("Q: When did you make a decision to seek new employment? A: I was looking for a new job when I was on sick leave."). Thus, as in *Turner*, the evidence here demonstrates that Plaintiff's resignation was not the compelled or forced result of intolerable or aggravated conduct by Defendant, but instead was his voluntary decision. Ultimately, his evidence "fail[s] to show he was subjected to working conditions rendering his job so intolerable that a reasonable person in his position would have felt compelled to resign." *Turner*, 7 Cal. 4th at 1253. As Plaintiff has failed to alleged sufficient facts to support that he was constructively discharged, he cannot maintain a cause of action for constructive discharge in violation of public policy. Accordingly, the Court GRANTS Defendant's Motion as to Plaintiff's constructive discharge in violation of public policy cause of action.

## H.    Failure to Indemnify for Business Expense

In his ninth cause of action, Plaintiff alleges that Defendant violated California Labor Code section 2802 by failing to reimburse him for all expenses he incurred prior to the end of his employment on June 1, 2012. FAC ¶¶ 66-70. He does not provide an accounting of these expenses however, nor a total amount allegedly owed. In his response to Defendant's interrogatories, Plaintiff stated that he submitted an expense reimbursement request for $380, but Defendant only reimbursed

UNITED STATES DISTRICT COURT
For the Northern District of California

1   $108. Dkt. No. 29, Ex. K (Pl.'s Resp. to Interrog. No. 23). Aside from this statement, however,

2   Plaintiff has submitted no other evidence in support of this claim. At his deposition, Plaintiff stated

3   that he could not remember what the reimbursements were for and that he did not keep a copy of his

4   request. Dkt. No. 29, Ex. E (Federico Depo) at 191:13-192:9. Defendant now moves for summary

5   judgment on the grounds that Plaintiff has no evidence to support his reimbursement claim.

6          The party opposing summary judgment must direct the Court to specific, triable facts.

7   *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009). But in his Opposition, Plaintiff

8   failed to even address this cause of action, let alone present specific facts. Thus, Plaintiff has not

9   opposed Defendant's contention that there is no evidence to support his claim. The reviewing court

10  is "not required to comb through the record to find some reason to deny a motion for summary

11  judgment." *Carmen*, 237 F.3d at 1029 (quoting *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409,

12  1418 (9th Cir. 1988)). And Plaintiff's conclusory allegations, unsupported by facts, are insufficient

13  to survive a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)

14  ("summary judgment motion cannot be defeated by relying solely on conclusory allegations

15  unsupported by factual data."). As Plaintiff has "failed to present any evidence in opposition to

16  [Defendant's] motion for summary judgment, []he has failed to demonstrate that there are any

17  genuine issues of material facts in dispute." *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

18  Accordingly, the Court GRANTS Defendant's Motion as to Plaintiff's section 2802 cause of action.

19  **I.     Unlawful Business Practices**

20         Plaintiff's fifth cause of action alleges that Defendant's conduct constitutes unfair and

21  unlawful business practices within the meaning of California Business and Professions Code section

22  17200 et seq. FAC ¶¶ 39-42. The Unfair Competition Law or "UCL," section 17200 prohibits the

23  following five different types of wrongful conduct: (1) an "unlawful . . . business act or practice" (2)

24  an "unfair . . . business act or practice;" (3) a "fraudulent business act or practice;" (4) "unfair,

25  deceptive, or untrue or misleading advertising;" and (5) "any act prohibited by [Bus. & Prof. Code

26  §§ 17500-17577.5]." Cal. Bus. & Prof. Code § 17200. The "unlawful" prong of the UCL proscribes

27  "anything that can be properly be called a business practice and that at the same time is forbidden by

28

law." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 717-18 (2001) (internal quotations omitted).  The "unlawful" practices prohibited by the UCL "are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory or court-made." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994).  Here, Plaintiff alleges that Defendant violated the UCL based on its conduct alleged in his other causes of action.  FAC ¶ 40.

In its Motion, Defendant argues that this claim must fail because all of the other causes of action fail.  Mot. at 27.  However, in his Opposition, Plaintiff states that "[b]y mis-classifying the Plaintiff and failing to pay him overtime and minimum wage, Defendant has violated the California IWC Wage Orders and the Labor code."  Opp'n at 15.  As discussed above, there remains a question of material fact as to whether Defendant misclassified Plaintiff as exempt.  Accordingly, the Court DENIES Defendant's Motion as to Plaintiff's unlawful business practices cause of action.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  Defendant's Motion is granted as to Plaintiff's sixth, eighth, and ninth causes of action.  Defendant's Motion is denied as to Plaintiff's first, second, third, fourth, fifth, and seventh causes of action.

**IT IS SO ORDERED.**

Dated: October 4, 2013

_____
Maria-Elena James
United States Magistrate Judge

40